JERRY RUSSELL BLISS, INC., Petitioner-Appellant and Cross-Appellee, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees and Cross-Petitioners.

Fifth District   No. 5—84—0559

Opinion filed October 30, 1985.

Thomas J. Immel, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Vincent W. Moreth, Assistant Attorney General, both of Chicago, of counsel), for appellees.

JUSTICE KASSERMAN delivered the opinion of the court:

Respondent, Jerry Russell Bliss, Inc., has filed the instant petition under section 41 of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1041) for review of a decision entered by the Illinois Pollution Control Board (Board) upon a complaint filed by the Illinois Environmental Protection Agency (IEPA) against respondents,

Jerry Russell Bliss, Inc. (Bliss, Inc.), Russell Bliss, Jay Covert, and Illinois Central Gulf Railroad (ICG). The IEPA has filed a cross-petition seeking review of the decision of the Board in dismissing counts I and II of its complaint.

In its original complaint, the IEPA alleged waste disposal violations (Ill. Rev. Stat. 1981, ch. 111½, par. 1021), water pollution and water pollution hazard violations (Ill. Rev. Stat. 1981, ch. 111½, par. 1012), and special waste hauling permit violations (Ill. Rev. Stat. 1981, ch. 111½, par. 1021(d)). After a hearing, the Board dismissed counts I, II and III of the complaint as to all respondents and further dismissed the remaining alleged violations against all respondents except Bliss, Inc., and Jay Covert. Bliss, Inc., and Covert were found to have committed water pollution hazard violations and special waste hauling permit violations. Bliss, Inc., was fined $3,000, and its special waste hauling permit was revoked. Covert, who is not a party to this appeal, was fined $100.

The record discloses the following facts: On the morning of April 14, 1982, Patrick McCarthy and two other employees of the IEPA began surveillance of the McKinley Street Bridge in Venice, Illinois. The purpose of this surveillance was to ascertain whether a Bliss Oil Company truck would go into the nearby ICG railroad yard. At approximately 1:45 p.m. McCarthy saw a truck with a Bliss Oil Company insignia affixed to it cross the bridge and proceed to the ICG yard. After the truck entered the yard, it began spraying a black liquid on the ground.

McCarthy and the two other IEPA employees immediately went to the yard in order to sample the material being sprayed. McCarthy entered the yard, stopped the truck, showed the driver his IEPA identification card, and asked the driver his name. The driver replied that his name was Jay Covert. When McCarthy asked the driver if he could take samples of the truck's liquid contents, the driver said that he could not allow this without permission from his boss. McCarthy asked the driver whom he should contact to get permission. Referring to the telephone number on the side of the truck, the driver said whoever answers the telephone. The driver possessed no special waste hauling manifest, bill of lading, or any other documentation concerning the load. Neither photographs taken of the truck nor the conversation between the driver and McCarthy were admitted to establish any connection between this load and Bliss, Inc.; however, the truck's license number, as noted by McCarthy, was listed on a special waste hauling permit issued to Bliss, Inc.

After speaking with the driver, the IEPA employees took five

samples of the black liquid material: one from the truck's dripping spray boom and four from the puddles of material surrounding the truck. A laboratory analysis of this material showed that the tested material contained over 10,000 parts per million of trichlorethylene. Trichlorethylene, or TCE, is listed by the Board as a toxic hazardous substance.

Perry Mann, an IEPA geologist, testified that the area where the spraying occurred is located approximately 1,200 feet from the Mississippi River. He stated that the soil in this area was a combination of silty clays, sands, and gravels and is prone to leaky artesian conditions, that is, water levels from below ground may tend to rise above the surface. He further testified that the surface water would tend to flow toward the Mississippi River. Mann admitted that his testimony was based upon the reports of others and not upon his own site-specific review of the ICG yard.

James Compagno, manager of the Venice ICG yard, testified that prior to April 14, 1982, "Bliss Oil" performed road-oiling services for the yard on a regular basis. Compagno testified that his signature of approval had been affixed to a copy of a Bliss, Inc., invoice requesting payment for an April 14, 1982, delivery of road oil.

On appeal Bliss, Inc., contends that: (1) the Board considered improper evidence in linking Bliss, Inc., to the alleged violations; (2) the findings that there were water pollution hazard violations are against the manifest weight of the evidence; and (3) respondent's special waste hauling permit could not be revoked because the permit had already expired prior to the Board's decision. On cross-appeal the IEPA contends that the Board should not have dismissed the waste disposal violations alleged against the respondents in counts I and II of the complaint.

The first contention made by Bliss, Inc., is that the evidence linking it to the spraying of the contaminated oil was insufficient. Specifically, it is argued that the Board improperly considered the following evidence in making its determination that Bliss, Inc., was culpable: (1) the conversation between the truck driver and IEPA employee McCarthy; and (2) the photographs taken of the truck at the ICG yard.

■■ In administrative review, a court need only determine whether there was sufficient competent evidence to support the decision under review. (*Lee v. Illinois Racing Board Laboratory* (1980), 87 Ill. App. 3d 667, 670-71, 410 N.E.2d 171, 175.) In the present case McCarthy testified that the truck which he saw spraying the contaminated oil had a Bliss Oil Company insignia affixed to the door. Additionally, the license plate number of this truck, which was obtained

through McCarthy's observations, matched the license plate number of a truck listed on the special waste hauling permit issued to Bliss, Inc. It was established through Compagno that Bliss Oil Company had performed road-oiling services for the Venice ICG yard on a regular basis prior to April 14, 1982. Furthermore, a copy of an invoice identifying itself as being sent by Bliss, Inc., was sent to the Venice ICG yard. This invoice, which requested payment for an April 14, 1982, delivery of road oil, was approved for payment by Compagno and sent to the ICG office in Chicago. Although we agree that it would have been impermissible for the Board to consider evidence of the conversation and the photographs, neither of which was admitted into evidence, there is sufficient competent evidence in the record to link Bliss, Inc., to the spraying of the contaminated oil.

■■ The second contention made by Bliss, Inc., is that the determination that there were violations of sections 12(a) and 12(d) of the Environmental Protection Act (Ill. Rev. Stat. 1981, ch. 111½, pars. 1012(a), 1012(d)) is contrary to the manifest weight of the evidence. Specifically, Bliss, Inc. alleges that there is no proof in the record that TCE was present in sufficient quantity or concentrations to constitute a water pollution hazard.

Sections 12(a) and 12(d) of the Environmental Protection Act provide that no person shall:

> "a. Cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act;
>
> * * *
>
> d. Deposit any contaminants upon the land in such place and manner so as to create a water pollution hazard;" (Ill. Rev. Stat. 1981, ch. 111½, pars. 1012(a), 1012(d).)

Since section 12(d) refers to conduct not yet amounting to a violation of section 12(a) (*Tri-County Landfill Co. v. Pollution Control Board* (1976), 41 Ill. App. 3d 249, 258, 353 N.E.2d 316, 324), a water pollution hazard must be found before either violation may be found.

Water pollution is defined by the Act as:

> "[s]uch alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or

welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish or other aquatic life." (Ill. Rev. Stat. 1981, ch. 111½, par. 1003(hh), as amended by Pub. Act 82—678, effective January 1, 1982.)

We conclude that the evidence presented at the hearing was insufficient to establish that the alleged discharge of TCE created a hazard of water pollution as defined by the Environmental Protection Act.

Although TCE is listed by the Board as a toxic hazardous substance (35 Ill. Admin. Code secs. 721.130, 721.133; 40 C.F.R. 261.31), a principal draftsman of the Environmental Protection Act recognized that the mere presence of a potential source of water pollutants on the land does not necessarily constitute a water pollution hazard. (See Currie, *Enforcement Under the Illinois Pollution Law*, 70 Nw. U. L. Rev. 389, 402-03 (1976).) In the present case it was shown that TCE contaminated oil was deposited in a quantity sufficient to puddle on the surface of the ground in an area which is located 1,200 feet from the Mississippi River and which is prone to leaky artesian conditions. It was also shown that this oil contained a TCE concentration in excess of 10,000 parts per million. However, no effort was made to establish that this particular quantity and concentration of TCE was likely to create a nuisance or to render the waters harmful, detrimental, or injurious. We therefore conclude that the finding of the Pollution Control Board that respondents were guilty of violations of sections 12(a) and 12(d) of the Environmental Protection Act must be reversed.

■ The third and final contention made by Bliss, Inc., is that the Board could not revoke the special waste hauling permit because the expiration of the permit prior to the Board's decision rendered the revocation moot. We do not agree.

The Board gave the following rationale for its decision to revoke the expired permit:

"While the permit in existence at the time of the incident expired on March 31, 1983, the Board's action today is not moot. The revocation of a permit has a continuing effect that does not end with the expiration of that permit. The grounds for the revocation may serve as a basis for the future denial of a permit application. *People ex rel. Carpentier v. Goers*, 20 Ill. 2d 272, 170 N.E.2d 159 (1960)."

A moot question is one that existed but which, because of the happening of certain events, has ceased to exist and no longer presents an actual controversy over interests or rights of a party. (*Johnson v.*

*Quern* (1980), 90 Ill. App. 3d 151, 155, 412 N.E.2d 1082, 1085.) Since the revocation of the expired permit has a future effect upon the ability of Bliss, Inc., to obtain another permit, the question of the propriety of the revocation of the permit in this case was not moot.

On cross-appeal the IEPA contends that the Board should not have dismissed counts I and II of its complaint against respondents Bliss, Inc., Russell Bliss, Jay Covert, and ICG. These counts, which alleged violations of the Environmental Protection Act and Board regulations regarding the transport and disposal of waste and special waste, were dismissed by the Board because the evidence presented was insufficient to prove that the substance released from the truck was a waste. The IEPA argues that it established a *prima facie* case that these violations had occurred when it showed that the road oil contained the listed toxic hazardous substance TCE.

■■ The Environmental Protection Act defines "waste" as:

"*** any garbage, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility or other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, commercial, mining and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under Section 402 of the Clean Water Act or radioactive materials discarded in accordance with the provisions of 'An Act to authorize the Director of Public Health to purchase, lease, accept or acquire suitable sites for the concentration and storage of radioactive wastes, to provide for supervision of the operation of such sites and to authorize the Department of Public Health to prepare and to enforce regulations pertaining to the use and operation of such sites' approved August 16, 1963, as now or hereafter amended, and as authorized by regulations promulgated pursuant to the 'Radiation Protection Act', approved July 17, 1959, as now or hereafter amended or any solid or dissolved material from any facility subject to the Federal Surface Mining Control and Reclamation Act of 1977 (P.L. 95—87) or the rules and regulations thereunder or any law or rule or regulation adopted by the State of Illinois pursuant thereto." (Ill. Rev. Stat. 1981, ch. 111½, par. 1003(ff), as amended by Pub. Act 82—678, effective January 1, 1982.)

Although we are not formally bound by administrative decisions interpreting the legal effect of statutory language, we will give the admin-

706

istrative agency's conclusion great weight in arriving at our own statutory construction. (*Whitley v. Board of Review* (1983), 116 Ill. App. 3d 476, 478, 451 N.E.2d 942, 944.) In the present case the Board dismissed counts I and II of the complaint because no evidence was presented as to whether the TCE was discarded and, therefore, a "waste" within the meaning of the Environmental Protection Act. We agree with the Board that the Environmental Protection Act defines "waste" as discarded material. Consequently, proof of the prior use or origin of a substance must be present to establish that a substance is a "waste." Since no evidence was presented regarding the prior use or origin of the TCE, the Board's dismissal of counts I and II of the complaint was proper.

For the foregoing reasons, the findings of the Pollution Control Board are affirmed except as to the findings that respondents were guilty of water pollution hazard violations.

Affirmed in part, reversed in part.

JONES, P.J., and KARNS, J., concur.